United States District Court
Middle District of North Carolina

| | | |
|---|---|---|
| Janet Hartmann, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | <u>Complaint</u> |
| | ) | |
| Aetna Life Insurance Company | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Janet Hartmann alleges the following for her complaint against defendant

Aetna Life Insurance Company ("Aetna").

<u>Nature of Controversy</u>

1.    Ms. Hartmann worked as a Consumer Product Strategic Analyst II for Bank

of America. until March 2, 2016. Bank of America provided long-term disability

coverage to Ms. Hartmann and other eligible employees pursuant to an insurance policy

issued by Aetna (the "Policy"). The Policy obligates Aetna to make eligibility

determinations and to pay policy benefits from its funds.

2.    Ms. Hartmann discontinued working at Bank of America due to rheumatoid

arthritis, fibromyalgia, migraine headaches, depression, and anxiety. Aetna approved Ms.

Hartmann for short-term disability benefits under Bank of America's short-term disability

plan and paid her benefits for 180 days, the maximum short-term benefit. Aetna then

began paying Ms. Hartmann monthly long-term benefits as of August 31, 2016. Aetna

terminated Ms. Hartmann's long-term disability benefits effective March 31, 2018 after

determining that she was no longer disabled under the terms of the Policy. After Ms. Hartmann exhausted her appeal remedies under the Policy, Aetna advised Ms. Hartmann that she had the right to sue to recover benefits pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA").

3.      Ms. Hartmann claims she is entitled to recover long-term disability benefits and other relief from Aetna pursuant to 29 U.S.C. § 1132 of ERISA. The relief Ms. Hartmann seeks is the reinstatement of her long-term benefits under the Policy retroactive to March 31, 2018, prejudgment interest, monthly long-term benefits for as long as she remains entitled to benefits under the terms of Aetna's Policy, and an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

## Parties, Jurisdiction, and Venue

4.      Ms. Hartmann is a citizen and resident of Stokes County, North Carolina.

5.      Defendant Aetna is an insurance company and is authorized to conduct business in this state by the North Carolina Department of Insurance. Aetna is the Policy's claims administrator.

6.      The Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 1132(e)(1). Venue is proper in this district pursuant to 29 U.S. C. § 1132(e)(2).

## Additional Facts

7.      Ms. Hartmann's job with Bank of America required her to sit for extended periods of time; perform repetitive upper extremity movements to use a computer keyboard, mouse and telephone; and lift and carry material weighing up to ten pounds. Her job duties included review and audit of loans for modifications, help with new

system projects, sitting and typing for the entire day, programming, writing programming scripts, using Excel for balancing numbers, using Powerpoint to prepare presentations, and reviewing data.

8.     Ms. Hartmann was first diagnosed with rheumatoid arthritis in January 2014 by Dr. Julio Bravo of Novant Health. At an appointment on January 18, 2016, Ms. Hartmann advised Dr. Bravo that she was feeling worse and had increased pain and fatigue. Dr. Bravo's physical examination was positive for tenderness in the wrists, knees, ankles, and feet. On March 2, 2016, Dr. Bravo completed an Attending Physician Statement form for Ms. Hartmann's short-term disability benefits claim. Dr. Bravo wrote that Ms. Hartmann's was disabled from rheumatoid arthritis and suffered from joint pain, swelling, and fatigue. He noted that Ms. Hartmann's treatment consisted of Simponi Aria IV infusions, Tramadol 50 mg every eight hours as needed, and follow-up visits every three months. Dr. Bravo recommended that Ms. Hartmann remain out of work through April 13, 2016.

9.     At Ms. Hartmann's next appointment with Dr. Bravo on April 25, 2016, Ms. Hartmann reported that she was feeling horrible and was experiencing shortness of breath; chest pains; dry eyes and mouth; fatigue; and a painful, itchy rash on her back. She stated that her legs felt wobbly and she needed help dressing. Dr. Bravo noted that Ms. Hartmann had moderate Stage 2 rheumatoid arthritis and was taking Simponi Aria infusions. Dr. Bravo found that Ms. Hartmann had 18 out of 18 Fibromyalgia tender points. Otherwise, her physical examination findings were the same as at the prior appointment.

3

10.     On May 9, 2018, Dr. Bravo completed an Attending Provider Statement form and wrote that Ms. Hartmann should remain out of work through her next appointment on June 9, 2016.

11.     Dr. Bravo's June 9, 2016 examination report states that Ms. Hartmann was feeling bad, hurting all over, and experiencing constant fatigue and pain. She had more bad days than good days, could not cook or drive long distances, and had difficulty with personal hygiene and dressing. Ms. Hartmann reported that she did not think the Simponi Aria infusions were working and requested another option. Dr. Bravo noted that Ms. Hartmann had tenderness in her shoulders, elbows, wrists, hands, knees, ankles, and feet. Dr. Bravo recommended that Ms. Hartmann discontinued the Simponi Aria injections, prescribed Depo Medrol 40 mg injections, and gave Ms. Hartmann information about another medication, Orencia. Ms. Hartmann's next appointment was scheduled for August 5, 2016.

12.     On June 27, 2016, Dr. Bravo wrote a note that stated Ms. Hartmann should remain out of work through August 5, 2016.

13.     At Ms. Hartmann's next appointment with Dr. Bravo, on August 4, 2016, Ms. Hartmann advised that her hands were "really bad;" she dropped things; and she had trouble brushing her teeth, washing her hands, cutting food, and pouring drinks into a glass. She had more bad days than good days and had pain every day. She was experiencing some pain relief after taking Tylenol with Tramadol. Ms. Hartmann reported that she was also taking Orencia. She was having issues with her short-term memory, had forgotten to pay some bills, and was constantly trying to figure out what

4

day it was. Dr. Bravo recommended a comprehensive metabolic panel. He noted that Ms. Hartmann was unable to return to work and requested that she see him again in three months.

14.     The same day, Dr. Bravo completed an Attending Provider Statement form. He wrote that Ms. Hartmann suffered from rheumatoid arthritis and fibromyalgia syndrome and that joint pain and tenderness limited her activities of daily living. He wrote "no" in response to a question asking whether Ms. Hartmann was likely to have a full recovery and added that any improvement she experienced would likely be "minimal."

15.     During the short-term disability benefit period, Aetna made numerous determinations that Ms. Hartmann was entitled to continued benefits. On March 3, 2016, Aetna advised Ms. Hartmann that her claim for short-term disability benefits had been approved through April 15, 2016. On April 20, 2016, Aetna advised Ms. Hartmann that her short-term disability benefits had been approved through April 25, 2016. On May 2, 2016, Aetna advised Ms. Hartmann that her short-term disability benefits had been extended through May 9, 2016. On June 17, 2016, Aetna advised Ms. Hartmann that her short-term benefits had been extended through June 17, 2016. On June 23, 2016, Aetna advised Ms. Hartmann that her claim for short-term disability benefits had been approved through August 30, 2016.

16.     Aetna advised Ms. Hartmann by a letter dated August 23, 2016 that her long-term disability application had been approved. Effective August 31, 2016, Aetna began paying Ms. Hartmann monthly long-term benefits. Aetna's internal claim notes

5

state that Ms. Hartmann's benefits were approved through February 27, 2018 based on medical evidence that her rheumatoid arthritis, chronic pain, and fibromyalgia prevented her from working. Another claim note states that Ms. Hartmann's identified restrictions and limitations "appear to be permanent."

17.     Dr. Bravo next saw Ms. Hartmann on November 14, 2016. She explained that she was not feeling well and was experiencing pain in her lower back and her shoulders, could not lift her hands very high, had numbness in her legs, and had difficulty getting out of bed due to pain. Sitting, standing, and walking made her pain worse. Dr. Bravo's physical examination findings included 18 out of 18 fibromyalgia tender points and tenderness in the lumbar spine and sciatic notch. Dr. Bravo determined that Ms. Hartmann was suffering from sciatica of the left side. He wrote that Ms. Hartmann could not return to work. His report states that he would obtain a comprehensive metabolic panel that day.

18.     An Aetna claim note dated December 9, 2016 indicates that the additional evidence submitted by Ms. Hartmann's providers supported continuing her disability payments.

19.     Dr. Bravo next saw Ms. Hartmann on December 19, 2016. The report states that Ms. Hartmann's laboratory test result was abnormal and that she had an elevated sedimentation rate. The finding an elevated sedimentation rate is consistent with autoimmune disorders including rheumatoid arthritis.

20.     Ms. Hartmann was seen by a neurologist, Dr. David Meyer, on January 3, 2017 for evaluation and treatment of her migraine headaches. Ms. Hartmann explained

that she was having daily headaches upon awakening in the morning. She advised that around half the headaches went away on their own, but the other half became more intense and reached the 10 out of 10 level of severity. The medications she had been taking, Keppra and Mirapex, had not made a significant impact on the headaches. Dr. Meyer recommended switching Ms. Hartmann's medications and advised her to continue taking clonazepam for muscle jerking.

21.     Ms. Hartmann was examined by Dr. Bravo on March 6, 2017. She reported that she was experiencing muscle pain, mainly in her legs; fatigue; and migraines. She was having difficulty with her activities of daily living due to her pain. Dr. Bravo's physical exam findings included tenderness in the hands, wrists, elbows, shoulders, knees, ankles and feet. Dr. Bravo and Ms. Hartmann completed the Clinical Disease Activity Index ("CDAI") Calculator for Rheumatoid Arthritis. The report states that Ms. Hartmann had a tender joint count of 28, a swollen joint count of 0, patient global activity of 7.5, and provider global activity of 7. The total score of 42.5 indicated that Ms. Hartmann had a "high severity" of rheumatoid arthritis. Dr. Bravo recommended continuing treatment with Orencia.

22.     The next day, March 7, 2017, Ms. Hartmann was seen by Terresa Long, NP of Comprehensive Pain Specialists for evaluation of her sciatica. Ms. Long found that Ms. Hartmann was suffering from multiple tender trigger points and had limited range of motion in her joints with evidence of synovitis. Ms. Long prescribed Nucynta 50 mg 1 tablet every eight hours.

23.     Ms. Hartmann next saw Dr. Meyer on March 14, 2017. She reported frustration due to increasing migraine frequency and the lack of an effective treatment. Ms. Hartmann reported that she had experienced 14 migraines per month since the last visit, the average severity of her migraines was seven to nine out of ten, and that she was currently taking Topamax and Tramadol. Dr. Meyer recommended that Ms. Hartmann begin taking Lamictal, increase her dosage of clonazepam, and discontinue taking pramipexole.

24.     Ms. Hartmann next saw Ms. Long on April 5, 2017, for evaluation of her low back pain, right and left side pain, and bilateral leg pain. Ms. Hartmann advised that she had recently fallen and was treated at the emergency department and was now using a walker to ambulate. It was noted that Ms. Hartmann was taking oxycodone 5 mg and Nucynta. Ms. Hartmann explained that her pain was constant, sharp, and throbbing; her pain score was a nine; and bending, stooping, lifting, carrying, and lying on her back or side exacerbated her pain. She advised that her condition interfered with her daily chores, employment, exercise, grooming, and sleep. Ms. Long's physical exam findings were unchanged from the prior appointment. Ms. Long wrote in her report that Ms. Hartmann was benefiting from oral opioid medications and recommended an MRI of Ms. Hartmann's lumbar spine.

25.     On May 29, 2017, Aetna requested updated medical records from Dr. David Meyer, Dr. Julio Bravo, and Ms. Theresa Long. The next day, May 30, 2017, Ms. Hartmann called Aetna and advised that she been in the emergency room following a fall

8

down stairs. Ms. Hartmann reported that she had a lot of swelling in her lower back and right hip joints and that she had been placed on a walker instead of a cane.

26.     An Aetna claim note dated May 31, 2017 states that Aetna determined after reviewing additional medical records that "at this point the identified restrictions and limitations appear to be permanent, no further Disability Nurse Reviewer involvement is anticipated."

27.     Ms. Hartmann next saw Dr. Bravo on June 27, 2018. Ms. Hartmann explained that her arthritis was getting worse. She continued to have morning stiffness that lasted 1.5 hours. She was unable to hold a gallon of milk, a cooking pot, or her toothbrush. Dr. Bravo prescribed Xeljanz 11 mg one tablet per day.

28.     On August 24, 2017, Ms. Hartmann was examined by Dr. Rich LeShock of Comprehensive Pain Specialists for her low back pain. Dr. LeShock refilled Ms. Hartmann's prescription for Butrans 10 mcg patch.

29.     On August 31, 2017 and September 25, 2017, Ms. Hartmann was seen by her primary care provider, Dr. William Graham, for chronic fatigue. Ms. Hartmann explained that her chronic fatigue had been getting worse. She was sleeping 16 to 20 hours per day. She mentioned that she had been on Butrans for the past four months and was taking Xeljanz for her rheumatoid arthritis. Dr. Graham decided to order laboratory testing and prescribed low-dose Decadron. At the September 25, 2017 appointment, Ms. Hartmann stated that her she could tell not any difference in her chronic fatigue with the low-dose Decadron, and Dr. Graham recommended discontinuing the Decadron and trying Provigil.

9

30.     Ms. Hartmann saw Dr. LeShock again on September 21, 2018. Dr. LeShock refilled Ms. Hartmann's Butrans prescription.

31.     Ms. Hartmann had an appointment with Dr. Edward Pollock of OrthoCarolina on October 18, 2018. The appointment was for a recheck of her left hip. Ms. Hartmann explained that over the past several months she had experienced increasing pain over the lateral aspect of her left hip near her trochanteric bursa. She was unable to rest on her right side because of the pain. Ms. Hartmann advised that she was also having discomfort over her left sacroiliac joint and left buttock. Her joints were stiff, and she was having difficulty stretching. Ms. Hartmann informed Dr. Pollock that she was using a Butrans patch to help control her discomfort in multiple joints. Dr. Pollock's physical examination notes indicate that Ms. Hartmann had limited range of motion of the left hip, moderate discomfort directly over the trochanteric bursa, and mild tenderness over the right sacroiliac joint. Dr. Pollock determined that Ms. Hartmann was suffering from trochanteric bursitis on the left side. He gave her an injection of .5 cc of Kenalog, 6 cc of Marcaine, and 3 cc of xylocaine and requested that she return in four to six weeks for a reevaluation.

32.     Ms. Hartmann next saw Dr. Bravo on November 12, 2017. She reported that she was feeling okay, had adrenal fatigue syndrome, was sleeping constantly, and was still in a lot of pain in her hands and wrists. Her knees were swelling up and she had pain in her toes and could not wear sneakers. Nothing made the pain better. Sitting made the pain worse. Ms. Hartmann's CDAI score was 40, which placed her in the high severity category for rheumatoid arthritis. Dr. Bravo confirmed that Ms. Hartmann had

10

tenderness in her hands, wrists, elbows, shoulders, knees, ankles and feet. Dr. Bravo

prescribed a trial of Kevzara and stated that Ms. Hartmann remained unable to work.

33.    Another Aetna claim note, dated November 14, 2017, indicates that Ms.

Hartmann's rheumatoid arthritis was a chronic and progressive condition and most likely

would not improve. The note reads, in part:

> There is medical evidence for impairment to sustained and/or consistent
> activities and tasking beyond self-care and ADLs. There is documentation
> and reported ongoing symptoms of chronic pain, hand, ankle, shoulders,
> wrist and back pain, swelling, fatigue with any increased activities,
> morning stiffness, weakness, limited ROM due to pain correlating with
> positive labs indicating rheumatoid factor and elevated sed rate. She is
> under treatment for Rheumatoid arthritis, fibromyalgia, chronic pain and
> migraine headaches. Despite ongoing treatment, changes in medications
> and dosages, she continues with ongoing chronic symptoms with little
> improvements and reportedly fell and now requires a walker for
> ambulation and is noted by pain management. The RA is a chronic and
> progressive condition and most likely will not improve. A change in her
> clinical condition would not be expected until the pain and multiple
> symptoms are under control. At this point the identified restrictions and
> limitations appear to be permanent, no further Disability Nurse Reviewer
> involvement is anticipated. If significant functional change is identified in
> updated LTD Claimant Interviews by DBM, request updated medical
> records at that time.

The same day, Aetna decided to update its medical records and proceed with a clinical

review. Aetna also decided to conduct two days of surveillance to monitor Ms.

Hartmann's activities.

34.    The next day, November 15, 2017, Aetna requested additional information

and documents to determine whether Ms. Hartmann remained eligible for benefits as of

February 28, 2018, the date the Policy definition of disability changed from "own

occupation" to "any occupation." Under the Policy, after benefits have been paid for 18

months, the claimant is considered disabled if the claimant is not able to work at any

11

reasonable occupation solely because of disease or injury. A "reasonable occupation" is defined as any gainful activity for which the claimant is, or may reasonably become, fitted by education, training or experience and which results in, or can be expected to result in, an income of more than 60% of the claimant's predisability earnings.

35. Aetna conducted surveillance of Ms. Hartmann on November 29 and 30, 2017. According to the investigator's report, Ms. Hartmann was not observed on either day.

36. On December 22, 2017, Ms. Hartmann underwent a left hip arthroscopy, trochanteric bursectomy, and labra debridement on the left side by Dr. Edward Pollock.

37. Ms. Hartmann next saw Dr. Bravo on January 25, 2018. Ms. Hartmann explained that she was feeling bad. She was having issues with her ankles "blowing up." The bottoms of her feet were burning 24 hours per day. She explained that she had morning stiffness that lasted at least one hour or more. She had trouble with her activities of daily living, dressing, cleaning, cooking, doing laundry, putting a coat on, and getting in and out of bed. Ms. Hartmann advised that she could sit only 20 minutes at a time, stand five minutes at a time, walk with help for 30 minutes, and fine manipulation was "a lot of trouble." Dr. Bravo's physical exam findings were unchanged from the last appointment. Ms. Hartmann's CDAI score was 42.5. Dr. Bravo recommended continuation of the current treatment with Kevzara.

38. At an appointment on February 7, 2018, Ms. Hartmann advised Dr. Pollock that her left hip was better. She continued to use a cane to support her mobility, but she was not having the severe discomfort she experienced prior to surgery. Dr.

Pollock recommended that Ms. Hartmann continue her physical therapy and advised her to call if she experienced increased pain or difficulty.

39.     Aetna informed Ms. Hartmann by a letter dated February 15, 2018, that a clinician had determined that Ms. Hartmann was able to work without restrictions and that Aetna had forwarded the clinician's report to Dr. Bravo for his review. The same day, the "clinician," (who was not a clinical health care provider, but was an Aetna employee named Jeannette Stehly, RN), sent identical letters to Dr. Bravo and to Dr. Pollack. The letters provided the doctors a place to sign to indicate that they agreed with Ms. Stehly's assessment of Ms. Hartmann's functionality.

40.     Dr. Bravo responded to Aetna's letter on February 20, 2018. At the bottom of the letter, he wrote: "We have ordered a Functional Capacity Evaluation." On February 19, 2018, Dr. Pollock responded by sending his clinic note dated February 7, 2018.

41.     Aetna conducted surveillance of Ms. Hartmann on February 22 through 24, 2018. The investigator reported that Ms. Hartmann was not observed on February 22, 2018. The report states that on February 23, 2018, at 1:39 p.m., Ms. Hartmann was observed standing next to a vehicle located at a shopping center in King, North Carolina. At 1:41 p.m., the vehicle departed the shopping center and arrived at Ms. Hartmann's home at 1:50 p.m. Ms. Hartmann was not observed for the remainder of the day. On February 25, 2018, Ms. Hartmann was observed departing her home at 10:29 a.m. in a vehicle driven by another female. The car stopped at a gas station. Ms. Hartmann exited the vehicle and stood near the fuel pumps, then retrieved a cane from the vehicle and

13

walked into the store. Ms. Hartmann reentered the passenger's seat of the vehicle at 10:43 a.m. The vehicle proceeded to Kindred Hospital and arrived there at 11:34 a.m. Ms. Hartmann and the other woman walked toward the hospital and entered it at 11:37 a.m. They exited the hospital at 11:57 a.m. and proceeded to Ms. Hartmann's home, arriving there at 3:02 p.m.

42. On March 16, 2018, at the recommendation of Dr. Bravo, Ms. Hartmann underwent a functional capacity evaluation ("FCE"). The evaluation was performed by a physical therapist, Trina Wilson, who utilized the ErgoScience Physical Work Performance Evaluation. According to Ms. Wilson's report, Ms. Hartmann was capable of performing full-time sedentary-level work. However, that conclusion is called into question by numerous other statements in the report. Ms. Wilson reported that Ms. Hartmann "self-limited" on 25% of the 20 tasks she was asked to perform. The report listed three possible causes of self-limiting behavior included (1) pain, (2) psychosocial issues such as fear of reinjury, anxiety or depression, or (3) attempts to manipulate the test results. The report further states that "although it is difficult to determine the causes of self-limiting behavior, our research indicates that motivated clients self-limit on no more than 20% of test items" and that if self-limiting exceeds 20%, then psychosocial and/or motivational factors are affecting test results."

43. Ms. Wilson did not state whether she believed that Ms. Hartmann's self-limiting behavior was due to pain, "psychosocial issues," or a desire to manipulate the test results. Nor did Ms. Wilson's report explain how Ms. Hartmann would be able to

work a full-time job if she was unable to perform 25% tasks administered as part of the assessment.

44.     At the outset of the FCE, Ms. Hartmann was counseled both orally and in writing to stop performing tasks that caused her pain. The written script, which was both read to Ms. Hartmann and signed by her includes these statements:

- I want you to perform to the best of your ability on all tasks. However, I do not want you to hurt yourself by overdoing it on a task.

- Throughout the test, I want you to let me know if any of the tasks cause you pain or significantly increase any pain that you already have.

- You may stop yourself at any time during the test.

- You can choose to stop yourself before I observe signs of maximum effort and I will respect your decision.

- There are good reasons for your stopping a task, such as: joint or muscle pain, chest pain, shortness of breath, dizziness, or fear of re-injury.

- You are the best judge of your body's abilities.

- Do not allow my observations to pressure you into continuing if you really feel you should stop.

- Pain is to be respected and if it builds up too much, you may choose to stop even if you have not reached your maximum.

- I will document that you stopped yourself on that particular task.

- You will not be forced to do anything you do not feel capable of doing.

- However, it's important for you to know that if I ask you to perform a task that you do not think you can perform, it's best that you at least attempt that task. Then, I can observe and document that you could not do it rather than documenting that you refused to try it.

45.     Ms. Wilson's FCE report indicates that Ms. Hartmann did not refuse to perform any of the five tasks on which she self-limited. Ms. Wilson noted in her report that Ms. Hartmann self-limited due to pain in her hands, knees, lower leg, and feet.

46.     Aetna informed Ms. Hartmann by a letter dated March 28, 2018, that it had determined that she was no longer eligible for benefits effective April 1, 2018. The letter cited Ms. Stehly's review and the FCE report as support for the termination. The letter advised Ms. Hartmann that she had 180 days to appeal.

47.     Ms. Hartmann was seen by Dr. Bravo on April 3, 2018. Dr. Bravo's report states that Ms. Hartmann is permanently disabled:

> Patient is permanently disable.
> Addendum:I have reviewed The disability definition and at this time Jane is totally disabled and is unable to perform the essential duties of any occupation for which she is reasonably qualified by training, education or experience.

The report states that Ms. Hartmann had trouble with dressing and household chores, could not hold a glass or piece of paper, had trouble holding a fork, could not use the TV remote control, had difficulty using her cellphone, and was able to sit for only 15 minutes at a time, stand for 15 minutes at a time, walk for up to 30 minutes with help, and was unable to do tasks involving fine manipulation.

48.     Ms. Hartmann submitted a written appeal on May 29, 2018. The appeal included 53 pages of records from Novant Health, including the January 25, 2018 and April 3, 2018 reports by Dr. Bravo.

49.     Ms. Hartmann submitted additional evidence in support of her appeal on July 19, 2018, including records from Comprehensive Pain Specialists and Novant

16

Health, the report of a second FCE performed on July 10, 2018, a neuropsychological examination report dated June 28, 2018, and reports from Ms. Hartmann's neurologist, Dr. Meyers.

50.     The records of Comprehensive Pain Specialists include a report of examination by Janelle Grossman, NP on January 9, 2018. The report states that Ms. Hartmann complained of bilateral leg pain with paresthesia in her feet due to rheumatoid arthritis and fibromyalgia. Ms. Hartmann reported that her pain was stable and that she wished to continue taking Dilaudid, which provided moderate pain relief. Ms. Grossman refilled Ms. Hartmann's prescription for Dilaudid 4 mg 1 tablet every eight hours. Ms. Grossman wrote that the goal of treatment was "to reduce pain by 20-40% and increase activity level."

51.     After receiving the report of the March 16, 2018 FCE, Ms. Hartmann discussed the matter with her primary care provider, Dr. Graham. Dr. Graham referred Ms. Hartmann for a second FCE, with a different provider. David Van Zandt performed the second FCE on July 10, 2018. Mr. Van Zandt concluded as a result of his evaluation that Ms. Hartmann was unable to work. He added that Ms. Hartmann did not demonstrate any symptom/disability exaggeration behavior and "passed 25/28 validity criteria during the FCE, 89%, which suggests good effort and valid results which can be used for vocational planning." Dr. Graham indicated his agreement with Mr. Van Zandt's conclusion by signing the report on July 12, 2018.

52.     Ms. Hartmann submitted a neuropsychological evaluation performed by Dr. Sarah Cook, Ph.D. of Duke Neuropsychological Service on June 28, 2018. The report

17

states that Dr. Meyer referred Ms. Hartmann for the evaluation due to her history of cognitive complaints. Ms. Hartmann advised Dr. Cook that her cognitive decline had been increasing since February or March 2018. She had a hard time remembering events and had left the stove on, had left doors opened, had bounced checks, and had to use alarms and reminders on her phone to remember things. Ms. Hartmann indicated that she had a hard time with names, word finding difficulty, and repeating herself. Dr. Cook found that Ms. Hartmann performed in the borderline and impaired categories in several measures of cognitive function, however, Dr. Cook could not determine if the low results were valid and reliable due to Ms. Hartmann's low scores in several measures of performance validity. Dr. Cook added that Ms. Hartmann's poor results on validity testing did not necessarily imply that Ms. Hartmann intentionally suppressed or manipulated her performance. According to Dr. Cook, poor validity scores could also occur in instances in which the patient was highly distressed, fatigued, on sedating medications, experiencing chronic pain, or was physically ill. Dr. Cook noted that Ms. Hartmann's poor scores were likely caused by her significant emotional distress, medication side effects, chronic pain, and poor sleep. Dr. Cook recommended that Ms. Hartmann undergo a reevaluation of her pain medications and individual psychotherapy.

53.     Aetna obtained a review of Ms. Hartmann's claim file dated August 22, 2018, by a consulting physician, Dr. Nichole Barry, a board-certified specialist in rheumatology. Dr. Barry opined that Ms. Hartmann's diagnoses were rheumatoid arthritis and fibromyalgia. Dr. Barry concluded that Ms. Hartmann's medical records presented no evidence of active rheumatoid arthritis that would support any functional limitations.

Regarding Ms. Hartmann's fibromyalgia, Dr. Barry wrote: "Fibromyalgia is a pain syndrome which is optimally managed by encouraging exercise and activity, not by limiting." Dr. Barry added that Ms. Hartmann had no documented side effects from the medications prescribed for her rheumatological symptoms. In response to a question from Aetna, Dr. Barry wrote that Ms. Hartmann suffered from persistent and chronic pain and fatigue but that the frequency, intensity, and duration of her symptoms were not specifically documented. In response to a question about whether the records supported Ms. Hartmann's contention that she was unable to work Dr. Barry wrote:

> No findings support the etiology of the pain reported as due solely to active rheumatoid arthritis. The level of pain reported is out of proportion to any findings due to active rheumatoid arthritis. The claimant also has fibromyalgia which is a pain syndrome, characterized by no findings on examination. The limitations described by the claimant are self-reported and based on pain, but out of proportion to findings of active RA. The majority of the pain and fatigue described are attributable to fibromyalgia, which does not support any functional limitations.

54.     Dr. Barry reported on her telephone all with Ms. Hartmann's primary care provider, Dr. Graham. According to Dr. Barry's report, Dr. Graham was "pretty emphatic" that Ms. Hartmann could not work any job due to joint pain and difficulty concentrating.

55.     On August 28, 2018, Aetna sent Dr. Barry's report for review to Dr. Bravo and Dr. David Meyer, Ms. Hartmann's neurologist.

56.     Dr. Bravo wrote handwritten comments on Dr. Barry's report and sent the report with his comments to Aetna on September 6, 2018. Dr. Barry stated his disagreement with several of Dr. Barry's conclusions. On the last page of Dr. Barry's

report, Dr. Bravo wrote that Ms. Hartmann was using an assistive device to ambulate and was having difficulty with her activities of daily living.

57.     Dr. Meyer responded that he had "no opinion re: rheumatology issues."

58.     Dr. Barry wrote an addendum in which she responded to handwritten comments. She wrote that no new information had been provided and that her original determination was unchanged. She concluded:

> The etiology of the self-reported complaint of pain is not definitely due to RA, based on lack of findings of active rheumatoid arthritis. The comorbid diagnosis of fibromyalgia, as the etiology of the pain, is a pain syndrome, which is managed by encouraging exercise and activity, not by limiting it. The pain due to fibromyalgia is not pathological and is not associated with a progressive joint destruction process. In fact, limiting activity with fibromyalgia results in more pain and fatigue, and is not recommended as means of managing this pain. Therefore, pain with activity should not be limiting.

59.     Aetna advised Ms. Hartmann by a letter dated September 20, 2018, that it had decided to uphold its decision to terminate benefits as of April 1, 2018. The letter contains this statement:

> It is your report of an inability to perform any work tasks, without experiencing pain. However, no findings support the etiology of the pain reported, due to active rheumatoid arthritis. The level of pain reported is out of proportion to any findings due to active rheumatoid arthritis. You also have fibromyalgia, which is a pain syndrome, characterized by no findings on examinations. The majority of your pain and fatigue described are attributed to fibromyalgia, which does not support any functional limitations.

The letter advised that Ms. Hartmann had exhausted her appeal rights under the Policy and that she had the right to sue under section 502(a) of ERISA.

60.     Following receipt of Aetna's September 20, 2018 letter, Ms. Hartmann hired counsel, who requested that Aetna reopen Ms. Hartmann's claim for the purpose of

considering additional medical records. On December 5, 2018, Ms. Hartmann's attorney submitted Ms. Hartmann's mental health treatment records from Mood Treatment Center and Old Vineyard Behavioral Health and records from a pain management specialist, Dr. David O'Toole.

61.     The mental health records show that Ms. Hartmann's mental health declined following Aetna's decision to terminate benefits. Ms. Hartmann sought counseling at Mood Treatment Center. On July 20, 2018, Ms. Hartmann's therapist, Ms. Theall, referred Ms. Hartmann for an intensive outpatient treatment program at Old Vineyard Behavioral Services. Ms. Hartmann was evaluated at Old Vineyard the same day and began a partial hospitalization program on July 23, 2018. Upon admission to Old Vineyard, Ms. Hartmann reported that she felt overwhelmed due to her ongoing disability case and medical issues, including rheumatoid arthritis, complex migraines, and chronic back pain. Ms. Hartmann advised that she experienced auditory hallucinations while falling asleep. Ms. Hartmann's mental status examination findings included soft speech, fair visual contact, depressed mood, flat affect, auditory hallucinations, fair judgment, and fair insight. The social worker who evaluated her checked the box for "symptoms/behaviors manifestations of such severity that there is interference with social and family functioning." Ms. Hartmann's PHQ-9 score was 27. A score of 15 or more is indicative of severe depression. Ms. Hartmann remained in the partial hospitalization program until September 28, 2018.

62.     Dr. O'Toole, a pain management specialist, first evaluated Ms. Hartmann on August 29, 2018, for evaluation of her back and hip pain. Ms. Hartmann rated her pain

as a nine on a ten-point scale. Dr. O'Toole's physical examination findings include pain in the paraspinous muscles extending from the occiput down into the shoulders, pain produced by extension and lateral side bending of the cervical spine, pain in the cervical facet joints, antalgic gait, pain produced by extension and lateral side bending of the lumbar spine, bending at the waist produced pain, positive Patrick's sign, lumbar paraspinal muscle tenderness, and 18 out of 18 positive pressure points consistent with the diagnosis of fibromyalgia. Dr. O'Toole determined that Ms. Hartmann's pain was consistent with fibromyalgia, rheumatoid arthritis, and polyarthralgia. He wrote:

> At this juncture, the patient has had extensive workup which has been negative for objective findings. Her symptoms appear to be more consistent with fibromyalgia than anything else, so I have discussed possibly pursuing trigger point injections for her symptoms.

Dr. O'Toole recommended against injections due to the diffuse nature of Ms. Hartmann's pain complaints and the lack of objective findings on her MRIs and x-rays. He increased her Lyrica dosage to 100 mg three times per day and prescribed MS Contin 15 mg by mouth twice a day to treat the pain associated with her diagnosis of rheumatoid arthritis.

63.     Dr. O'Toole's physical examinations support Ms. Hartmann's pain complaints and confirmed her diagnosis of fibromyalgia based on trigger point testing. Dr. O'Toole was convinced that Ms. Hartmann's problems were real and warranted a prescription for a strong narcotic medication. This medication provided Ms. Hartmann with only about 50% relief and produced mild sedation.

64.     Aetna refused to consider the additional medical records submitted by Ms. Hartmann's attorney. In a letter dated December 11, 2018, Aetna advised: "Since we've made our final decision, no other action will be taken by us."

<u>Claim for Relief</u>
(29 U.S.C. § 1132(a)(1)(B) and (g))

65.     The other allegations of this complaint are incorporated by reference.

66.     The Policy is an employee welfare benefit plan within the meaning of ERISA. Ms. Hartmann is covered by the Policy.

67.     Aetna failed to provide Ms. Hartmann a full and fair review of her claim for benefits under the Policy.

68.     Ms. Hartmann is entitled to recover from Aetna long-term disability benefits under the Policy from March 31, 2018 to the date of judgment, with prejudgment interest, and continuing monthly benefits after the date of judgment for as long as she remains eligible under the terms of the Policy.

69.     Ms. Hartmann requests an award of attorney's fees and costs against Aetna pursuant to 29 U.S.C. § 1132(g).

<u>Prayer for Relief</u>

Wherefore, having complained of Aetna, Ms. Hartmann prays the Court for the following relief:

1.     A judgment that Aetna is obligated under the terms of the Policy to pay Ms. Hartmann long-term disability benefits for the period from March 31, 2018 to the date of judgment, with prejudgment interest;

23

2.      A judgment that Aetna is obligated to pay Ms. Hartmann monthly disability income benefits after the date of judgment for as long as she remains eligible for such benefits under the terms of the Policy;

3.      An award of attorney's fees and costs against Aetna pursuant to 29 U.S.C. § 1132(g); and

4.      Such other relief as the Court deems just and proper.


January 10, 2019                                    /s/ Andrew Whiteman
Date                                                Andrew Whiteman
                                                    N.C. State Bar Number 9523
                                                    Daniel Watts
                                                    N.C. State Bar Number 49598
                                                    Whiteman Law Firm
                                                    5400 Glenwood Ave., Suite 225
                                                    Raleigh, North Carolina 27612
                                                    Tel: (919) 571-8300
                                                    Fax: (919) 571-1004
                                                    aow@whiteman-law.com
                                                    dcw@whiteman-law.com